31 F.3d 860
 Tomas ARMENDARIZ; Rosa Armendariz; Harry Julian Brown,
Jr.; Lance A. Bukouskis, et al., Plaintiffs-Appellees,
v.
James F. PENMAN; W.R. Holcomb; David M. Stachowski; Cecil
Dillard; Kenneth J. Henderson, et al.,
Defendants-Appellants.
Tomas ARMENDARIZ; Rosa C. Armendariz; Harry Julian Brown,
Jr.; Lance A. Bukouskis, et al., Plaintiffs-Appellees,
v.
James F. PENMAN; W.R. Holcomb; David M. Stachowski; Cecil
Dillard; Kenneth J. Henderson, et al., Defendants,
and
Al Boughey; Larry Reed, Defendants-Appellants.
Tomas ARMENDARIZ; Rosa C. Armendariz, Plaintiffs-Appellees,
v.
James F. PENMAN, Defendant-Appellant.
 Nos. 93-55393, 93-55587 and 93-55748.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 7, 1994.
Decided Aug. 1, 1994.
 
 Christopher D. Lockwood, MacLachlan, Burford & Arias, San Bernardino, CA, for all defendants-appellants except W.R. Holcomb.
 Cynthia Ludvigsen, San Bernardino, CA, for defendant-appellant W.R. Holcomb.
 Darlene Fischer Phillips, Hill, Farrer & Burrill, Los Angeles, CA, for plaintiffs-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before: FARRIS, O'SCANNLAIN, and TROTT, Circuit Judges.
 OPINION
 FARRIS, Circuit Judge:
 
 
 1
 In 1991, the City of San Bernardino closed a number of low-income housing units in the Arden-Guthrie section of town pursuant to a series of housing code inspections, referred to in the trade as "sweeps". Plaintiffs own or owned 95 four-unit apartment buildings in Arden-Guthrie, a substantial number of which were closed during the sweeps. They contend that 1) the purpose of the sweeps was to force (a) persons with criminal records and (b) gang members to relocate outside of the city of San Bernardino, 2) that pre-closure and post-closure procedures afforded in connection with the sweeps were deficient, and 3) that plaintiffs improperly were denied loans.
 
 
 2
 San Bernardino City Attorney James F. Penman, Mayor William R. Holcomb, and other city employees appeal the district court's denial of their motions for summary judgment based on qualified immunity. We have jurisdiction of the timely appeal pursuant to the collateral order doctrine. Act Up!/Portland v. Bagley, 988 F.2d 868, 870 (9th Cir.1993). There have been no prior interlocutory appeals. Nelson v. Silverman, 999 F.2d 417 (9th Cir.1993).
 
 
 3
 With the exception of their procedural due process claims, the plaintiffs have failed to state claims under 42 U.S.C. Sec. 1983 or the Fair Housing Act. The defendants have qualified immunity as to all claims, except the procedural due process claims against defendants Larry Reed and James Penman. Thus, we affirm in part and reverse in part.
 
 
 4
 * James Penman, the elected City Attorney for the City of San Bernardino since 1987, claims that he devised the plan for stepping up code enforcement in San Bernardino to enhance code compliance in the city and reduce crime. Penman's attorney argues that "crime tends to increase blight which in turn leads to more crime, which in turn leads to more blight, in a downward spiral." Penman coordinated code enforcement actions with key agencies and sat at meetings at which the areas targeted for the code sweeps were selected. Penman also attended each code sweep as coordinator. At the sweeps, Penman ensured that the city agencies worked together. However, the actual decisions as to what constituted a code violation were made by City staff. Although plaintiffs' complaint concerns the code sweeps which took place in Arden-Guthrie after January 16, 1991, other similar actions took place in 1988, 1989 and 1990 in other sections of San Bernardino.
 
 
 5
 William R. Holcomb, former mayor of San Bernardino, is accused of 1) promoting the code enforcement sweeps to enable a commercial developer to bulldoze the area and replace it with a supermarket; 2) failing to control the City Attorney's office in its plot to evacuate criminals, and 3) falsely promising to extend loans to owners seeking to rehabilitate their properties.
 
 
 6
 Holcomb admits to discussions with a local developer, John Edwins, regarding a supermarket in Arden-Guthrie. Edwins provided the city attorney with a list of buildings that could have their electrical meters removed to keep those buildings vacant. Although the Arden-Guthrie development plan did not advance beyond the planning stage, some buildings included in Edwins' list were eventually closed during the sweeps. Holcomb acknowledges statements regarding rehabilitation loans from the city, but there is no evidence of his participation in the loan process.
 
 
 7
 Kenneth Henderson is executive director of the San Bernardino Redevelopment Agency. Nestor Nazario is a former employee at the agency. They are accused of promising loans for the rehabilitation of properties without ever intending to make the loans.
 
 
 8
 The Redevelopment Agency is charged with the responsibility of eliminating slums and blight and providing decent, sanitary housing. The primary financing tool used by the Agency is tax increment financing. The Agency also provides financial assistance to private developers and property owners to bring about commercial, industrial and housing development projects, including construction and rehabilitation.
 
 
 9
 Only three of the plaintiffs (Elvoid, Wennen, and Rampello) contacted Henderson and Nazario with regard to loans. The other plaintiffs did not oppose Henderson and Nazario's motion for summary judgment. Wennen withdrew his loan request "when it became clear" to him that the loan would not be forthcoming. Elvoid and Rampello applied and, according to defendants, were denied on the basis of insufficient equity. Both Elvoid and Rampello dispute the city's appraisal of their property and argue that the loan denials were pretextual.
 
 
 10
 Larry Reed and Al Boughey are accused of "initiating and implementing the code enforcement sweeps." Boughey was Director of Planning and Building Services after June 17, 1991. Reed was his predecessor. Boughey took office before the last sweep and participated as an observer. Reed was present at one code enforcement sweep as an observer.
 
 II
 
 11
 Qualified immunity is a judicially created doctrine that stems from the conclusion that few individuals will enter public service if such service entails the risk of personal liability for one's official decisions. Malley v. Briggs, 475 U.S. 335, 339, 106 S.Ct. 1092, 1095, 89 L.Ed.2d 271 (1986). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, ----, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (quoting Malley, 475 U.S. at 343, 106 S.Ct. at 1097). Immunity, whether absolute or qualified, "spare[s] a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991).
 
 
 12
 Defendants are entitled to summary judgment based on qualified immunity if plaintiffs' complaint fails to state a federal claim, Siegert, 500 U.S. at 233, 111 S.Ct. at 1793-94; or if in light of clearly established principles governing their conduct, they objectively could have believed their conduct was lawful, Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039-40, 97 L.Ed.2d 523 (1987); or there is no genuine issue of material fact as to whether defendant engaged in conduct violating plaintiffs' clearly established constitutional rights. Burgess v. Pierce County, 918 F.2d 104, 106 n. 3 (9th Cir.1990). The district court's rejection of a qualified immunity defense is reviewed de novo. Act Up!/Portland, 988 F.2d at 871. We must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Tzung v. State Farm Fire & Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989).
 
 III
 
 13
 Have Plaintiffs Asserted a Constitutional Violation?
 
 
 14
 "A necessary concomitant to the determination of whether the constitutional right asserted by the plaintiff is 'clearly established' at the time the defendant acted is the determination of whether [the] plaintiff has asserted a violation of a constitutional right at all." Siegert, 500 U.S. at 232, 111 S.Ct. at 1793. Plaintiffs frame their case in terms of two causes of action, the first under section 1983 and the second under the Fair Housing Act. However, plaintiffs actually raise four separate claims.
 
 
 15
 1) that closure of their property without pre-deprivation notice or hearing, exigent circumstances, and without post-closure hearings violated their rights to procedural due process;
 
 
 16
 2) that the city's invocation of its emergency powers when they knew that no exigent circumstances justified such measures violated their rights to substantive due process;
 
 
 17
 3) that the city's decision to conduct sweeps in Arden-Guthrie because of its desire to relocate criminals and reduce gang-related activity violated their rights to equal protection of the law; and
 
 
 18
 4) that the city's decision to focus the sweeps on Arden-Guthrie had a disparate impact on the minority community of San Bernardino in violation of the Fair Housing Act.
 
 
 19
 The facts alleged by plaintiffs can be held to state a claim for the denial of procedural due process against Holcomb, Penman, Reed and Boughey. However, they cannot be held to state a claim for any other federal statutory or constitutional rights against any of the defendants. Siegert, 500 U.S. at 233, 111 S.Ct. at 1793-94; Navarro v. Barthel, 952 F.2d 331, 333 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 2324, 119 L.Ed.2d 243 (1992).
 
 1. Procedural Due Process
 
 20
 Plaintiffs allege that defendants violated their right to procedural due process because their property was closed without pre-deprivation notice or hearing despite the fact that defendants knew that no exigent circumstances warranted such action. According to defendants, these allegations, without more, do not state a constitutional violation. Because they reasonably believed that an emergency situation existed, the post-closure process afforded plaintiffs under the city's housing code and state law was all the process that was due.
 
 
 21
 The district court did not rule directly on whether plaintiffs had failed to allege a constitutional violation at all. However, because the court proceeded to analyze whether the law was clearly established, it can be assumed that the court found that plaintiffs had stated a constitutional violation. We review such a determination de novo, taking all material allegations of the nonmoving party as true and construing them in the light most favorable to the nonmoving party. Figueroa v. United States, 7 F.3d 1405, 1409 (9th Cir.1993). We affirm on this issue.
 
 
 22
 "Ordinarily, due process of law requires an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest." Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 19, 98 S.Ct. 1554, 1565, 56 L.Ed.2d 30 (1978) (emphasis added). Thus, it is only in extraordinary circumstances involving "the necessity of quick action by the State or the impracticality of providing any [meaningful] pre-deprivation process" that the government may dispense with the requirement of a hearing prior to the deprivation. Logan v. Zimmerman Brush Co., 455 U.S. 422, 436, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982).
 
 
 23
 Summary governmental action taken in emergencies and designed to protect the public health, safety and general welfare does not violate due process. Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 299-300, 101 S.Ct. 2352, 2372-73, 69 L.Ed.2d 1 (1981); North Am. Cold Storage Co. v. Chicago, 211 U.S. 306, 319-20, 29 S.Ct. 101, 105-06, 53 L.Ed. 195 (1908). Government officials need to act promptly and decisively when they perceive an emergency, and therefore, no pre-deprivation process is due. However, the rationale for permitting government officials to act summarily in emergency situations does not apply where the officials know no emergency exists, or where they act with reckless disregard of the actual circumstances. Sinaloa Lake Owners Ass'n v. Simi Valley, 882 F.2d 1398, 1406 (9th Cir.1989), cert. denied, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990).
 
 
 24
 We also require no pre-deprivation process where the loss is the result of "a random and unauthorized act by a state employee," and there is no showing that post-deprivation procedures for obtaining compensation are inadequate or "that it was practicable for the State to provide a pre-deprivation hearing." Parratt v. Taylor, 451 U.S. 527, 541 & 543, 101 S.Ct. 1908, 1916 & 1917, 68 L.Ed.2d 420 (1981). It is irrelevant whether the state employee's actions were intentional or reckless. The important question is "whether the state is in a position to provide for pre-deprivation process." Hudson v. Palmer, 468 U.S. 517, 533-34, 104 S.Ct. 3194, 3203-04, 82 L.Ed.2d 393 (1984).
 
 
 25
 Parratt does not apply where "the state has procedures, regulations or statutes designed to control the actions of state officials, and those officials charged with carrying out state policy act under the apparent authority of those directives." Piatt v. MacDougall, 773 F.2d 1032, 1036 (9th Cir.1985) (en banc). In addition, Parratt does not apply where deprivation is predictable, pre-deprivation process is not impossible, and the defendants are specifically charged with the authority to effect the deprivation charged. Zinermon v. Burch, 494 U.S. 113, 135-138, 110 S.Ct. 975, 988-90, 108 L.Ed.2d 100 (1990); Sierra Lake Reserve v. Rocklin, 938 F.2d 951, 957 (9th Cir.1991), vacated --- U.S. ----, 113 S.Ct. 31, 121 L.Ed.2d 4 (1992), on remand, 987 F.2d 662 (9th Cir.1993).
 
 
 26
 The San Bernardino plaintiffs allege that defendants knew there was no emergency. Defendants closed their properties without a pre-deprivation hearing in order to relocate gang members and persons with a criminal record outside of the San Bernardino city limits. Plaintiffs have stated a claim under section 1983 for unconstitutional deprivation of procedural due process. Taking their allegations as true, their claim fits within the exceptions to Hodel and Parratt marked out in Sinaloa Lake Owners and Zinermon.
 
 
 27
 If defendants knew that no emergency existed in Arden-Guthrie and merely stated that an emergency existed in order to further other policies, then the Hodel exception to the general requirement that plaintiffs receive a pre-deprivation hearing before their property is boarded up does not apply. In addition, plaintiffs' allegations more closely approximate the situation in Zinermon than Parratt. The defendants are those persons who are assigned the duty of interpreting and enforcing the housing and fire codes. If plaintiffs' allegations are true, it would have been reasonably foreseeable that the deprivation would occur since it was the intent of the defendants for it to occur. Also, if the emergency was a fabrication, then pre-deprivation process was possible. Defendants could have warned plaintiffs of whatever violations they detected and held hearings afterward to determine whether closure was warranted under the circumstances. As a result, plaintiffs have stated a claim for procedural due process violations under 42 U.S.C. Sec. 1983 with regard to defendants Holcomb, Boughey, Reed, and Penman.
 
 2. Substantive Due Process
 
 28
 Plaintiffs allege that Penman, Boughey and Reed closed their property arbitrarily and capriciously with no "substantial relation to the public health, safety, morals or general welfare" in violation of their rights to substantive due process. Plaintiffs also allege that Holcomb, Henderson and Nazario violated their right to substantive due process because their loan applications were denied arbitrarily and capriciously. We reverse on this issue.
 
 
 29
 Substantive due process refers to certain actions that the government may not engage in, no matter how many procedural safeguards it employs. Blaylock v. Schwinden, 862 F.2d 1352, 1354 (9th Cir.1988). Substantive due process guards against arbitrary and capricious government action. Sinaloa Lake Owners, 882 F.2d at 1407. Where the governmental action constitutes a physical taking, the harm of a substantive due process violation is deemed to occur at the time of the allegedly wrongful governmental action. Hall v. Santa Barbara, 833 F.2d 1270, 1281 n. 28 (9th Cir.1986), cert. denied, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988). However, where there has been no physical invasion, substantive due process claims are barred by the requirement that there be a "final decision" by the relevant state administrative agency. Shelter Creek Dev. Corp. v. Oxnard, 838 F.2d 375, 379 (9th Cir.), cert. denied, 488 U.S. 851, 109 S.Ct. 134, 102 L.Ed.2d 106 (1988); Kinzli v. Santa Cruz, 818 F.2d 1449, 1456 (9th Cir.1987), cert. denied, 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988); see also Sinaloa Lake Owners, 882 F.2d at 1407.
 
 
 30
 To establish a violation of substantive due process, the plaintiff must prove that the government's action was "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." Euclid v. Ambler Realty Co., 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926); Sinaloa Lake Owners, 882 F.2d at 1407; Bateson v. Geisse, 857 F.2d 1300, 1303 (9th Cir.1988). Thus, any government action which "has no substantial relation to the public health, safety, morals, or general welfare" is arbitrary and unreasonable and the converse is also true. That is, where the government action has a substantial relation to the general welfare, the action is not arbitrary and unreasonable and not violative of substantive due process.
 
 
 31
 In addition, "in determining whether substantive due process rights have been violated, we look to such factors as the need for the governmental action in question, the relationship between the need and the action, the extent of harm inflicted, and whether the action was taken in good faith or for the purpose of causing harm." Sinaloa Lake Owners, 882 F.2d at 1409 (citing Rutherford v. Berkeley, 780 F.2d 1444, 1446 (9th Cir.1987)). Malicious, irrational and plainly arbitrary actions are not within the legitimate purview of the state's power. Moore v. City of East Cleveland, 431 U.S. 494, 520-21, 97 S.Ct. 1932, 1946-47, 52 L.Ed.2d 531 (1977) (Stevens, J., concurring).
 
 
 32
 The plaintiffs allege that the closure of their properties for the purpose of relocating criminals and reducing crime in Arden-Guthrie was arbitrary, capricious, and without rational relation to the public health, safety, morals or general welfare. They do not dispute that the housing code violations were valid. They only argue that no emergency existed, that Penman, Boughey and Reed knew no emergency existed, and that the closure of their property was not undertaken for the purpose of enforcing the housing and fire codes but rather to reduce crime by relocating criminals and reducing urban blight.
 
 
 33
 However, the reduction of crime by relocating criminals and reducing urban blight bears a rational relation to the public health, safety and general welfare. Thus, although the Penman, Reed and Boughey may have "faked" the emergency, their doing so bore a sufficient relation to the general welfare such that plaintiffs have no claim for a violation of substantive due process.[1]
 
 
 34
 Plaintiffs also claim their substantive due process rights were violated as a result of their denial of loans. Because the denial of loans does not constitute a physical invasion, plaintiffs' claims are unripe. They must first appeal the decision as to whether they were entitled to the loans such that it is clear that the loan denial is final. Sinaloa Lake Owners, 882 F.2d at 1407; Kinzli, 818 F.2d at 1456.[2]
 
 
 35
 None of plaintiffs' allegations constitute claims for a violation of substantive due process against any of the defendants. Plaintiffs only claims against Henderson and Nazario were based upon a denial of substantive due process. As a result, Henderson and Nazario have qualified immunity. Holcomb, Penman, Boughey and Reed have qualified immunity with respect to plaintiffs' substantive due process claims.
 
 3. Equal Protection
 
 36
 Plaintiffs allege that Penman, Reed and Boughey violated their right to equal protection of the law because their community was singled out arbitrarily, capriciously and maliciously for the code enforcement sweeps. According to Penman, Reed and Boughey, this allegation, without more, does not constitute a constitutional violation because there is a rational relation between their selection of Arden-Guthrie for the sweeps and the acknowledged goal of the sweeps of crime reduction and relocation of criminals. We reverse on this issue.
 
 
 37
 Plaintiffs can establish an equal protection claim if they can show that the City of San Bernardino's officials enforced the housing and fire codes in an arbitrary or invidiously discriminatory manner. Sierra Lake Reserve, 938 F.2d at 958. Although equal protection challenges to state action that does not "trammel[ ] fundamental personal rights or implicate[ ] a suspect classification" receive only rational basis scrutiny, "the rational relation test will not sustain conduct by state officials that is malicious, irrational or plainly arbitrary." Lockary v. Kayfetz, 917 F.2d 1150, 1155 (9th Cir.1990); Sinaloa Lake Owners, 882 F.2d at 1409. Rational basis scrutiny requires only that the state articulate a "rational relationship" between its action and a "legitimate state interest." New Orleans v. Dukes, 427 U.S. 297, 303-04, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).
 
 
 38
 The San Bernardino plaintiffs allege that Arden-Guthrie was selected for the code sweeps because of the city's desire to relocate criminals and reduce crime, which bears no rational relationship to the enforcement of the housing and fire codes. However, the reduction of crime is a legitimate state interest. Penman, Reed and Boughey have argued that blight and crime are interrelated in areas like Arden-Guthrie. It was rational for the city to target high crime areas for housing code enforcement sweeps in order to reduce blight and therefore crime. Plaintiffs have not stated a claim for a violation of their rights under the equal protection clause. Penman, Reed and Boughey have qualified immunity with respect to plaintiffs' equal protection claims.
 
 4. The Fair Housing Act
 
 39
 Plaintiffs claim that the sweeps violated their rights under the Fair Housing Act because they had a disparate impact on minorities in San Bernardino. They have introduced evidence that a significant number of minorities were impacted by the sweeps. However, as Penman, Reed and Boughey point out, they have not shown, and have not attempted to show, that the impact of the sweeps on the community in Arden-Guthrie was different from the impact the sweeps would have had on other communities in San Bernardino. Because plaintiffs have not alleged that the sweeps would have had an impact on fewer minorities in other communities and because plaintiffs have not alleged that the sweeps were conducted with the intent to discriminate against any minorities, they have not alleged sufficient facts to state a claim for a violation of the Fair Housing Act. Keith v. Volpe, 858 F.2d 467 (9th Cir.1988), cert. denied, 493 U.S. 813, 110 S.Ct. 61, 107 L.Ed.2d 28 (1989). Penman, Reed and Boughey have qualified immunity with respect to plaintiffs' Fair Housing Act claims.
 
 IV
 
 40
 Could The Defendants Objectively Have Believed That Their
 
 
 41
 Conduct Was Lawful?
 
 
 42
 In order to determine whether Holcomb, Penman, Reed and Boughey are entitled to qualified immunity for their possible violations of plaintiffs' constitutional rights to procedural due process, we apply a two part test. First, we determine whether the law governing the official's conduct was clearly established. Second, we determine whether, under that law, a reasonable officer could have believed that his conduct was lawful. Act Up!/Portland, 988 F.2d at 871. Even where an officer's actions are based on a mistaken conclusion, he is entitled to immunity as long as the mistaken conclusion is objectively reasonable. Id. at 872.
 
 
 43
 The district court found that the law was not clearly established at the time Holcomb, Penman, Reed and Boughey acted, but that nevertheless, their actions were "so egregious that any reasonable person would have recognized a constitutional violation." We affirm as to the procedural due process claim because the law was clearly established at the time Holcomb, Penman, Reed and Boughey acted and it was unreasonable for them to believe that their actions were constitutional. Taking plaintiffs' allegations to be true, Holcomb, Penman, Reed and Boughey deliberately construed the situation to be an emergency even though they knew no emergency existed in order to avoid providing plaintiffs the requisite pre-deprivation hearings due to them under the constitution.
 
 1. Clearly Established
 
 44
 The plaintiff bears the burden of proving that the constitutional right allegedly violated was clearly established at the time of the alleged misconduct. Baker v. Racansky, 887 F.2d 183, 186 (9th Cir.1989) (citing Davis v. Scherer, 468 U.S. 183, 197, 104 S.Ct. 3012, 3020-21, 82 L.Ed.2d 139 (1984)). To determine whether plaintiffs had a right to a pre-deprivation hearing the court "survey[s] the legal landscape" as it existed in 1991. Figueroa, 7 F.3d at 1409 (quoting Wood v. Ostrander, 879 F.2d 583, 591 (9th Cir.1989), cert. denied, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990)). The court begins by "looking at those cases that are 'most like' the instant case." Figueroa, 7 F.3d at 1409. The exact situation need not have been the subject of a prior case. If there are cases establishing a clear constitutional right, the question for the court is whether those cases are meaningfully distinguishable from the instant case. Id.
 
 
 45
 In January, 1991, when the sweeps in Arden-Guthrie took place, the law was well established that the Fourteenth Amendment's due process clause guarantees the right to a pre-deprivation hearing except where exigent circumstances make such a hearing impracticable. Logan, 455 U.S. at 436, 102 S.Ct. at 1158. In 1989, we held that the rationale for permitting government officials to act summarily in emergency situations does not apply where the officials know no emergency exists. Sinaloa Lake Owners, 882 F.2d at 1406. Holcomb, Penman, Reed and Boughey knew or should have known that they were not free to dispense with pre-deprivation hearings where they acted with the knowledge that no emergency existed.
 
 
 46
 In addition, in January, 1991, the Supreme Court had already decided Zinermon (February 1990). There, the Court held that Parratt does not apply where the possibility of deprivation at a specific time is predictable and it is not impossible for the state to afford plaintiffs pre-deprivation process and the defendants involved are those specifically charged with the authority to effect the deprivation charged. Zinermon, 494 U.S. at 138, 110 S.Ct. at 990; Sierra Lake Reserve, 938 F.2d at 957. Holcomb, Penman, Reed and Boughey knew or should have known that, as the officials specifically charged with the enforcement of the housing and fire codes, they were not free to invent emergencies in order to circumvent the due process clause.
 
 
 47
 2. Was Defendants' conduct reasonable?
 
 
 48
 Where, as here, plaintiffs carry their burden of showing the law was clearly established at the time of the Holcomb, Penman, Reed and Boughey's alleged misconduct, then the officers must prove that their conduct was reasonable even though it might have violated constitutional standards. Benigni v. Hemet, 879 F.2d 473, 479-80 (9th Cir.1988). Whether it was reasonable for the Holcomb, Penman, Reed and Boughey to have acted as the plaintiffs allege they did, despite the fact that their conduct was unconstitutional, is a question of law to be determined by the court. Act Up!/Portland, 988 F.2d at 873; Bryant, 502 U.S. at ----, 112 S.Ct. at 537; Creighton, 483 U.S. at 641, 107 S.Ct. at 3039-40.
 
 
 49
 Holcomb, Penman, Reed and Boughey do not allege that the conduct attributed to them was reasonable. It would not have been reasonable for Holcomb, Penman, Reed and Boughey to claim there was an emergency when they knew that there was no emergency and to use the emergency to deprive plaintiffs of property without a pre-deprivation hearing.
 
 V
 
 50
 Is There A Genuine Issue Of Fact As To Whether Defendants
 
 
 51
 Engaged In The Conduct Alleged By Plaintiffs?
 
 
 52
 Where an interlocutory appeal is made possible by the denial of a colorable claim of qualified immunity, we consider any issue fairly presented by the record which relates to that issue. See, e.g., Wagner v. Wheeler, 13 F.3d 86, 90-91 & n. 2 (4th Cir.1993); Wright v. Southern Ark. Regional Health Ctr., Inc., 800 F.2d 199, 202-03 (8th Cir.1986) (collecting cases). Thus, we will find qualified immunity where there was no genuine issue of fact as to whether the defendants engaged in the conduct alleged, despite the fact that it was possible for the government official to violate the constitutional right in question had he actually engaged in that conduct. Burgess, 918 F.2d at 106.
 
 
 53
 The district court found there were genuine issues of fact with regard to plaintiffs' allegations against all of the defendants. Plaintiffs have not stated a constitutional claim against Henderson and Nazario, therefore Henderson and Nazario have already established qualified immunity. Mayor Holcomb is entitled to qualified immunity because there is no genuine issue of material fact as to whether he set in motion the events that led to the city's alleged decision to fabricate an emergency in order to avoid providing plaintiffs with a pre-deprivation hearing. Boughey is entitled to qualified immunity because there are no genuine issues of fact as to whether he formulated policy for the sweeps. There remain sufficient questions of fact as to whether Penman and Reed engaged in the conduct alleged that summary judgment on the basis of qualified immunity is improper.
 
 1. Mayor Holcomb
 
 54
 Plaintiffs imply that Mayor Holcomb, as the chief executive in San Bernardino, is liable for the procedural due process violations allegedly suffered by plaintiffs at the hands of the city. Their argument is that the Mayor set in motion the events that led to their deprivation of procedural due process. However, plaintiffs have not alleged, nor have they introduced any evidence tending to show, that the Mayor devised the policy of using false emergencies to close down plaintiffs' property. Thompkins v. Belt, 828 F.2d 298, 304 (5th Cir.1987). At most, the plaintiffs vaguely allege that the Mayor was involved in a conspiracy to deprive them of their rights without providing support for the allegation or clarifying its meaning. There is no genuine issue of fact as to whether there is a causal connection between the Mayor's actions and the alleged constitutional violations suffered.
 
 2. Reed & Boughey
 
 55
 Al Boughey was hired by the city to be Director of Planning and Building Services just before the last sweep took place. Nevertheless, he is accused of implementing the city's policies during that sweep that led to the deprivation of plaintiffs' rights to procedural due process. In addition, Boughey is alleged to have failed to provide sufficient guidance to his employees as to the appropriate constitutional standard for exigent circumstances.
 
 
 56
 A supervisor may be liable based on either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. Hansen v. Black, 885 F.2d 642, 646 (9th Cir.1989) (citing Belt, 828 F.2d at 303-04). Plaintiffs have alleged that Boughey played a role in establishing the policies and procedures for the sweeps. However, all of the record evidence offered by plaintiffs with regard to whether Boughey played a role in establishing policy relates to Larry Reed or was written after the last Arden-Guthrie sweep took place (July 22, 1991). There is no record evidence that Boughey was personally involved in the constitutional deprivations. As a result, Boughey is entitled to qualified immunity.
 
 
 57
 Larry Reed is similarly alleged to have taken affirmative steps to implement the city's sweep policy before he was replaced by Boughey. However, unlike Boughey, plaintiffs have introduced record evidence showing that Reed played a role in the formation of policy related to the sweeps. Thus, if plaintiffs can establish that they were deprived of procedural due process as a matter of policy, Reed would be answerable under the theory of supervisory liability. Hansen, 885 F.2d at 646.
 
 3. Penman
 
 58
 Because Penman coordinated the sweeps and initiated the city's policy of conducting sweeps, Penman is the principal focus of plaintiffs' lawsuit. He is alleged to have devised the plan of using the specter of exigent circumstances to deprive plaintiffs of their rights to procedural due process. Penman does not dispute that he was the principal architect of the sweeps policy. There is a genuine issue of material fact as to whether the sweeps policy was to close down buildings because of minor violations that did not pose a threat to health and safety without a pre-deprivation hearing in order to relocate criminals. As such, there is a genuine issue of material fact as to whether the sweeps policy deprived plaintiffs of their rights to procedural due process. There is therefore a genuine issue as to whether Penman is liable based on plaintiffs' theory of supervisory liability.
 
 VI
 
 59
 We reverse the district court denial of Henderson, Nazario, Holcomb and Boughey's motions for summary judgment based on qualified immunity. We affirm the district court's denial of Reed and Penman's motions for summary judgment based on qualified immunity in the context of plaintiffs' claims based on violations of their rights to procedural due process. AFFIRMED IN PART AND REVERSED IN PART. Each side shall bear its own costs.
 
 
 60
 TROTT, Circuit Judge, concurring in part and dissenting in part:
 
 
 61
 I concur in the majority's opinion, except for the conclusion that plaintiffs do not state a substantive due process claim against Penman and Reed. The majority contends that even if the emergency closures were designed to relocate criminals and reduce urban blight rather than to respond to dangerous housing code violations, and even if the defendants "faked" the emergency, the closures did not violate substantive due process because they "bore a sufficient relation to the general welfare." In other words, because the government has a legitimate interest in reducing crime, it can pretextually use emergency powers granted by the housing code to serve that purpose.
 
 
 62
 With all respect to my colleagues, I don't see how the law permits them to reach that result. To establish a substantive due process violation, plaintiffs must prove only that the government's action was "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926); see Sinaloa Lake Owners Ass'n v. City of Simi Valley, 882 F.2d 1398, 1407 (9th Cir.1989), cert. denied, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). In Sinaloa Lake Owners, another case involving allegations of a "faked" emergency used to justify a deprivation, we held that plaintiffs stated a substantive due process claim arising from the state's breach of a privately-owned dam and destruction of a privately-owned lake. Plaintiffs alleged that the state knew or should have known that no emergency existed which justified the action. We observed:
 
 
 63
 The exercise of emergency powers is particularly subject to abuse.... Exigent circumstances often prompt actions that severely undermine the rights of citizens, actions that might be eschewed after more careful reflection or with the benefit of safeguards that normally constrain governmental action.
 
 Id. at 1410. Accordingly, we held that
 
 64
 [w]hether government officials invoked emergency powers when they knew, or well should have known, that no exigency justified use of such draconian measures, is therefore highly relevant in determining whether the government has violated the plaintiff's substantive due process rights.
 
 
 65
 Id.
 
 
 66
 Here, plaintiffs allege the city forced people out of their homes and kept them out based on a lie--that the residences were so dangerous under the housing code that emergency closures were necessary. If that, once proved, is not an abuse of the police power, I don't know what is. The majority's retort is not enough. The action cannot be justified as a means to control crime. If criminals are living in the units, the police should arrest them. If crime in the area is rampant, the police should put a stop to it. The city cannot simply start throwing innocent people out of private property to reduce crime in a troubled neighborhood. A contrary rule is simply unimaginable.
 
 
 67
 Imagine if the plaintiffs in Sinaloa Lake Owners owned land below the dam. Suppose the area was a high-crime area like Arden-Guthrie. Would the majority really claim it was not arbitrary and unreasonable for the government to breach the dam and flood the area on the pretext of emergency in order to suppress crime? Of course not. But closing housing units in Arden-Guthrie on the pretext of emergency has the same effect. Future crime might be reduced, but people are unreasonably and illegitimately dislocated. We grant the government enormous powers in emergencies. If the government maliciously and intentionally abuses those powers, I think a substantive due process claim as well as a procedural due process claim is stated in light of Sinaloa Lake Owners.
 
 
 68
 Defendants dispute these allegations and deny they "faked" anything. If the housing code violations truly justified emergency closures, so be it. However, at this stage in the litigation, I think plaintiffs have presented sufficient evidence to survive summary judgment on their substantive due process claim against Penman and Reed.
 
 
 
 [1]
 The dissent disagrees with this conclusion. However, Judge Trott cites no case law in support of his argument. In Sinaloa County the court specifically found that the government's action bore no relation to the public health, safety or general welfare. In addition, his example, drawn vaguely from the facts in Sinaloa County is inapposite because his hypothetical governmental action bears no substantial relation to the general welfare. Whereas in Arden-Guthrie, the housing units were closed until the property owners remedied what they acknowledge were real housing code violations (and blight creates vice creates more blight), in the Sinaloa County hypothetical, the government was flooding the community, thereby causing irreparable damage. No one would argue that the destruction of a community bears a substantial relation to the general welfare. However, the same could not be said about temporary closings in Arden-Guthrie
 
 
 [2]
 This analysis does not apply to plaintiff Wennen, who never went through with his loan application. His claim is unripe for lack of "any" decision regarding the denial of a loan